IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| DUEL THOMAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) 16 C 6284 |
| vs. | ) |
| | ) Judge Gary Feinerman |
| TARRY WILLIAMS, MARK RAHIMI, STANLEY | ) |
| JENKINS, ANNA MCBEE, and SYTERA SANDERS, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

In this *pro se* suit under 42 U.S.C. § 1983, Duel Thomas, an Illinois prisoner housed at Stateville Correctional Center, alleges that Stateville officials Tarry Williams, Mark Rahimi, and Stanley Jenkins violated the Eighth Amendment by improperly subjecting him to strip searches and that Stateville officials Anna McBee and Sytera Sanders violated the First Amendment when they retaliated against him by failing to investigate and erroneously denying his grievance regarding the strip searches. Doc. 12. With discovery closed, Doc. 67, Defendants move for summary judgment, Doc. 72. The motion is granted in part and denied in part.

**Background**

The Seventh Circuit "has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015) (citing cases); *see also Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."). Thomas's *pro se* status

does not excuse him from complying with Local Rule 56.1. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011) ("Though courts are solicitous of *pro se* litigants, they may nonetheless require strict compliance with local rules."); *Wilson v. Kautex, Inc.*, 371 F. App'x 663, 664 (7th Cir. 2010) ("[S]trictly enforcing Local Rule 56.1 was well within the district court's discretion, even though Wilson is a *pro se* litigant.") (citation omitted); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("[E]ven pro se litigants must follow rules of civil procedure.").

Consistent with the local rules, Defendants filed a Local Rule 56.1(a)(3) statement of undisputed facts with their summary judgment motion. Doc. 73. The relevant factual assertions in the Defendants' Local Rule 56.1(a)(3) statement cite evidentiary material in the record and are supported by the cited material. *See* N.D. Ill. L.R. 56.1(a) ("The statement referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph."). Also consistent with the local rules, Defendants served on Thomas a Local Rule 56.2 Notice, which explains what Local Rule 56.1 requires of a *pro se* litigant opposing summary judgment. Doc. 76.

Local Rule 56.1(b)(3)(B) required Thomas to file a "concise response to [Defendants' Local Rule 56.1(a)(3)] statement … contain[ing] … a response to each numbered paragraph in [it], including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. L.R. 56.1(b)(3)(B). Thomas has not

2

responded to Defendants' Local Rule 56.1(a)(3) statement in the manner prescribed by Local Rule 56.1(b)(3)(B). Instead, Thomas submitted two briefs, Docs. 81, 82, that respond substantively to the arguments set forth in Defendant's brief, Doc. 74, and a sworn statement of fellow inmate Rickey Robinson, Doc. 83. Because Thomas does not present Robinson's averments through a Local Rule 56.1(b)(3)(B) response or Local Rule 56.1(b)(3)(C) statement, they are disregarded for purposes of summary judgment. *See Thorncreek Apts. III, LLC v. Vill. of River Forest*, 970 F. Supp. 2d 828, 838-39 (N.D. Ill. 2013) (holding that facts may be presented on summary judgment only through a compliant Local Rule 56.1 statement or response) (citing cases). And because Thomas has failed to properly address the factual assertions in Defendants' Local Rule 56.1(a)(3) statement, those factual assertions are deemed admitted. *See* N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Olivet Baptist Church v. Church Mut. Ins. Co.*, 672 F. App'x 607, 607 (7th Cir. 2017) ("The district court treated most of the [defendant's] factual submissions as unopposed, because the [plaintiff] failed to contest them in the form required by Local Rule 56.1(b). We have held that the district court is entitled to enforce that rule in precisely the way it enforced the rule in this litigation."); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion.") (internal quotation marks omitted).

That said, the court is mindful that "a nonmovant's failure to respond to a summary judgment motion or failure to comply with Local Rule 56.1 … does not … automatically result in judgment for the movant. [The movant] must still demonstrate that it is entitled to judgment as a

3

matter of law." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) (citations and internal quotation marks omitted). The court therefore will recite the facts in the Defendants' Local Rule 56.1(a)(3) statement, viewing the facts and inferences therefrom as favorably to Thomas as the record and Local Rule 56.1 allow. *See Canen v. Chapman*, 847 F.3d 407, 412 (7th Cir. 2017). The court then will determine whether, on those facts, the Defendants are entitled to summary judgment. At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

Thomas is a Stateville prisoner in the custody of the Illinois Department of Corrections ("IDOC"). Doc. 73 at ¶ 1. At all relevant times, McBee was Stateville's Grievance Officer; Sanders was a Correctional Counselor; Jenkins and Rahimi were Lieutenants; and Williams was the Warden. *Id*. at ¶¶ 2-6.

Thomas was employed as a dietary worker in the Stateville kitchen from September 2013 through September 2017. *Id*. at ¶ 13. Starting in March 2015 and for approximately two months thereafter, Thomas was subjected to "daily strip searches." *Id*. at ¶ 14. The strip searches would occur when Thomas and the other kitchen workers "got off work, probably between seven, eight and nine" at night. *Id*. at ¶ 15. Correctional officers "would walk [the kitchen workers] to the room, … they would put some on that side, some on this side, and the officers would stand in the middle and they would tell [the inmates] to start to strip, start to take [their] clothes off." *Id*. at ¶ 16. In each instance, "around seven or eight" inmates were strip searched at a time by "about six" correctional officers. *Id*. at ¶ 17. The officers would order each inmate to "open [his] mouth … [to] stick [his] tongue out [and] up and down," and then would "run fingers through [his] hair, flop [his] ears, grab [his] genitals … pull [the] foreskin back on [his] penis … after that, lift up [his] scrotum

4

… turn around, bend over at the waist, take [his] hands, spread [his] buttocks and then come back up, and [require him] to lift [his] right feet and left feet and wiggle [his] toes." *Id.* at ¶ 18. During the strip searches, the officers "would crack jokes here and there about little stuff, or you catch them, they're laughing, stuff like that." *Id.* at ¶ 21. Jenkins and Rahimi would observe and supervise the strip searches while standing outside the room, but would not conduct the searches or issue orders to the inmates. *Id.* at ¶ 22.

The strip searches were ordered due to a substantial increase in inmates being caught with contraband from the kitchen that they would use to make homemade alcohol or "hooch," which posed a significant security concern. *Id.* at ¶ 38. It is common for inmates to be strip searched under circumstances that present an increased safety or security threat, such as when they return from a job assignment, the visiting room, or some other area where they are more likely to access contraband. *Id.* at ¶ 40. Williams told Thomas that he ordered the strip searches because of a "hooch problem." *Id.* at ¶ 25.

After the kitchen worker strip searches began, inmates were "still getting caught with hooch." *Id.* at ¶ 28. On or about May 18, 2015, Thomas told a psychologist at Stateville that he was "starting to feel symptoms of anxiety, thinking of ways to avoid work and spending time worrying about whether or not he w[ould] be searched every night." *Id.* at ¶ 29. Thomas did not attempt to seek mental health treatment after his visit with the psychologist because the strip searches started to be not "as frequent as they" had been. *Id.* at ¶ 30. When the strip searches occurred daily, Thomas did not ask to be reassigned or terminated from his kitchen position. *Id.* at ¶ 31. After two months, their frequency slowed to approximately "three, four" times per week in June 2015, and less frequently after that. *Id.* at ¶ 32. Thomas's biggest concern with the strip

5

searches was that they were conducted in the presence of other inmates and in an "unsanitary environment." *Id*. at ¶ 33. Prison officials "never cleaned the room," which had "holes in the walls," and the floor was "filthy" and "damp." *Id*. at ¶ 34.

Thomas filed one grievance regarding the strip searches, dated May 14, 2015, complaining that "on or about March 13, 2015 and continuing through this day I have and still am being unreasonably, unlawfully and unconstitutionally stripped and body cavity searched every day after I leave my work assignment in the inmate dietary … ." *Id*. at ¶ 44. Sanders responded to the grievance on May 20, 2015, writing: "[Y]our grievance is untimely you have 60 days for which to file a grievance from the date of discovery. Your date of discovery is noted on 3-13-15. Your grievance date is 5-14-2015 thus exceeding 60 days." *Id*. at ¶ 45. On January 19, 2016, McBee recommended that the Warden deny the grievance because "it was not filed within 60 days of discovery of the incident, occurrence, or problem which gives rise to the grievance as required in DR 504F." *Id*. at ¶ 46. The regulation cited by McBee states: "[A] grievance shall be filed within 60 days after the discovery of the date of the incident, occurrence, or problem that gives rise to the grievance. However, if an offender can demonstrate that a grievance was not timely filed for good cause, the grievance shall be considered." *Id*. at ¶ 47.

## Discussion

### I.  Eighth Amendment Strip Search Claim Against Rahimi, Jenkins, and Williams

"A strip-search in jail or prison can be cruel and unusual punishment. A prisoner states a claim under the Eighth Amendment when he plausibly alleges that the strip-search in question was motivated by a desire to harass or humiliate rather than by a legitimate justification, such as the need for order and security in prisons." *King v. McCarty*, 781 F.3d 889, 897 (7th Cir. 2015) (citations and internal quotation marks omitted). There is no triable issue concerning whether strip

searching the Stateville kitchen workers was motivated by a legitimate correctional justification. As Williams told Thomas, the strip searches were ordered due to an ongoing "hooch" problem at Stateville. Doc. 73 at ¶ 25. Thomas himself recognized that the strip searches were ordered because of the "hooch thing," that he knew "people was still getting caught with hooch" after the strip searches began, and that the searches continued for several weeks because the officers "couldn't catch nobody." *Id.* at ¶¶ 27-28. And the record otherwise confirms that the kitchen workers were strip searched because of a significant increase in the number of inmates being caught with "hooch" and other contraband likely to have originated from the kitchen. *Id.* at ¶ 38. Defendants accordingly are entitled to summary judgment as to Thomas's claim that the strip searches had no legitimate penological justification.

That conclusion does not extinguish Thomas's claim in its entirety, for "[e]ven where prison authorities are able to identify a valid correctional justification for the search, it may still violate the Eighth Amendment if conducted in a harassing manner intended to humiliate and cause psychological pain." *King*, 781 F.3d at 897 (internal quotation marks omitted). Under the principles set forth in *Mays v. Springborn*, 575 F.3d 643 (7th Cir. 2009), the record would allow a reasonable juror to find that the manner of conducting the strip searches violated the Eighth Amendment.

Viewing the record in the light most favorable to Thomas, he and the other kitchen workers were strip searched in groups of "around seven or eight," in an undivided room, in view of one another. Doc. 73 at ¶¶ 16, 17, 33. Strip searches may be conducted in a group setting only "for a valid reason." *Mays*, 575 F.3d at 650. Rahimi and Jenkins do not provide any such reason; rather, they deny that they conducted any group searches in the first place, asserting that each inmate was

7

searched in a private screening area by a single officer. Doc. 73 at ¶ 39. But in *Mays*, where the prison guards likewise denied that they had conducted group strip searches, the Seventh Circuit held that a jury had to resolve the factual dispute over how the searches were conducted. *See* 575 F.3d at 650 ("If the jury found that [the group searches] were performed without a valid reason—and the guards provided no justification because they denied performing them—it could have found for [the plaintiff]."). The same result follows here, where the record presents a genuine dispute as to whether Thomas was subjected to unjustified group strip searches.

Moreover, and again construing the record in the light most favorable to Thomas, the strip searches took place in a "filthy" and "damp" room that was "never cleaned" and had "holes in the walls." Doc. 73 at ¶ 34. A jury could conclude that the strip searches were repeatedly conducted in that setting in an effort to harass or humiliate the searched inmates. *See Mays*, 575 F.3d at 650 ("[The jury] could have also found that the [strip] searches were intended to harass based on testimony about the guards' … dirty gloves[] and the temperature of the room where the searches were done."). Likewise, record evidence indicating that correctional officers laughed during the searches and made comments to one another, Doc. 73 at ¶ 21, could support a jury finding that the searches were intended to harass or humiliate. *See Mays*, 575 F.3d at 650 ("[The jury] could have also found that the [strip] searches were intended to harass based on testimony about the guards' demeaning comments … .").

For these reasons, Defendants' summary judgment motion is denied as to Thomas's claim against Rahimi and Jenkins, who allegedly supervised the strip searches, that the searches were conducted in a manner that violated the Eighth Amendment. However, because there is no evidence that Williams was aware that the searches were conducted in the manner alleged by Thomas,

8

summary judgment is granted for Williams. *See Sides v. City of Champaign*, 496 F.3d 820, 827 (7th Cir. 2007) ("[A] supervisor is not liable for the acts of her subordinates under § 1983 unless she was aware of and approved her employees' conduct."). Rahimi and Jenkins are not entitled to qualified immunity, as *Mays* made clear years before their alleged conduct that group strip searches conducted in unsanitary and uncomfortable conditions by guards uttering demeaning comments violate the Eighth Amendment. *See White v. Pauly*, 137 S. Ct. 548, 551 (2017) ("[F]or a right to be clearly established, existing precedent must have placed the … constitutional question beyond debate.") (internal quotation marks omitted).

## II. First Amendment Retaliation Claim Against Defendants Sanders and McBee

To survive summary judgment on his First Amendment retaliation claim, Thomas must present evidence that would allow a reasonable juror to find that: (1) he engaged in activity protected under the First Amendment; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the First Amendment activity was at least a motivating factor in Defendants' decision to take retaliatory action. *See Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). Thomas's grievance was a protected activity for the purposes of this claim. *See Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012) (holding that the plaintiff stated a retaliation claim based on a deprivation that followed his use of the prison grievance system). Defendants argue, however, that Thomas fails to establish the two other elements of his claim.

Thomas filed one grievance regarding the strip searches. Doc. 73 at ¶ 44. The grievance was dated May 14, 2015 and complained about conduct that began on March 13, 2015. *Ibid*. The grievance was reviewed by Sanders and McBee, and denied because it did not comply with the rule requiring that a grievance be filed within sixty days of the incident giving rise to the grievance. *Id.* at ¶¶ 45-46, 48. Thomas argues that his grievance was not untimely because he could have filed a

9

grievance "for each day he was subjected to said searches." Doc. 81 at ¶ 5; Doc. 82 at ¶ 7. He suggests that untimeliness was only a pretext, and that "it felt like [Sanders] was trying to protect the company employees and officers … by giving [him] this simple response to [his] grievance without investigating it … ." Doc. 73 at ¶ 43.

Even on Thomas's own account, McBee and Sanders did not reject his grievance to retaliate against him for filing the grievance; rather, he maintains that they wrongfully denied the grievance to protect their colleagues. That may be improper, but it is not First Amendment retaliation. *See Owens v. Hinsley*, 635 F.3d 950, 954 (7th Cir. 2011) ("[T]he alleged mishandling of [the plaintiff's] grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim."). Thomas has adduced no evidence that McBee and Sanders—whose jobs consisted, at least in part, of processing grievances—denied his grievance *because he filed it*. Just to state the theory reveals its implausibility. Because the record would not allow a reasonable juror to find that Thomas's filing a grievance was "at least a motivating factor" in the decision to dismiss it as untimely, he cannot satisfy the third element of his retaliation claim.

Additionally, Thomas has not adduced any evidence that the deprivation he suffered—the denial of his grievance—was sufficient to deter him from filing future grievances. In fact, because Thomas has been able to pursue his claim in court, he has hardly suffered any deprivation at all. *See Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness.").

On either or both of these two independent grounds, Sanders and McBee are entitled to summary judgment on Thomas's First Amendment retaliation claim.

### III. Damages

Because Thomas is a prisoner, his suit is subject to the Prison Litigation Reform Act, which provides that "[n]o Federal civil action may be brought by a prisoner … for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Thomas concedes that the strip searches did not cause him physical injury. Doc. 81 at ¶ 8. He is therefore barred from recovering "compensatory damages for mental and emotional injuries suffered." *Calhoun v. DeTella*, 319 F.3d 936, 941 (7th Cir. 2003) (internal quotation marks omitted). His Eighth Amendment can proceed, however, because § 1997e(e) is "inapplicable to awards of nominal or punitive damages for [an] Eighth Amendment violation." *Ibid*.

Defendants assert that they are entitled to summary judgment as to punitive damages because Thomas has adduced no evidence of "evil motive or intent, or … reckless callous indifference to [Thomas's] federally protected rights." Doc. 73 at 13 (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). But in an Eighth Amendment case, "the level of culpability required for a liability finding is the same as the punitive damages standard: both require a determination that the defendants acted with deliberate indifference or reckless disregard for the plaintiff's right to security." *Walsh v. Mellas*, 837 F.2d 789, 801 (7th Cir. 1988); *see also Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 930 (7th Cir. 2004) ("Punitive damages are recoverable in § 1983 actions where the defendant had a reckless or callous disregard to the federally protected rights of others. This is the same standard as for § 1983 liability."). Thus, Thomas's allegations regarding the manner of conducting the strip searches could support a punitive damages award just as they can support a finding that Defendants violated the Eighth Amendment.

**Conclusion**

Defendants' summary judgment motion is granted in part and denied in part. The motion is granted as to Thomas's Eighth Amendment claim that the policy of strip searching inmate kitchen workers was motivated by a desire to humiliate or harass, as well as his First Amendment retaliation claim. The motion is also granted, as to Williams only, as Thomas's claim that the manner of conducting the strip searches violated the Eighth Amendment. That claim shall proceed to trial against Rahimi and Jenkins.

June 22, 2018 _____
United States District Judge